18SL-CC04398

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

## MISSOURI CIRCUIT COURT
## TWENTY-FIRST JUDICIAL CIRCUIT
## ST. LOUIS COUNTY

RONALD KLOCK by and through his
representative, JEAN KLOCK, JEAN KLOCK
surviving spouse of RONALD KLOCK, on
behalf of all legal heirs of RONALD KLOCK,
RONNIE ARD, by and through his
representative SANDI ARD, SANDI ARD,
surviving spouse of RONNIE ARD, on behalf
of all legal heirs of RONNIE ARD,
HENRY CLARK, by and through his
representative, PATRICIA CLARK, PATRICIA
CLARK surviving spouse of HENRY CLARK,
on behalf of all legal heirs of HENRY CLARK,
MELVIN HARVELL, by and through his
representative, SUE HARVELL, SUE
HARVELL surviving spouse of MELVIL
HARVELL, on behalf of all legal heirs of
MELVIL HARVELL,
SALLY GEISE, by and through her
representative GARY GEISE, GARY GEISE
surviving spouse of SALLY GEISE on behalf of
all legal heirs of SALLY GEISE,
JAMES BINGHAM,
ANITA BOUCK,
JEFFREY BREEDEN,
NELSON BRITTEN,
BRUCE BUTTERFIELD,
RHENITA CLAY,
GAIL COILTON,
BARBARA CORCORAN,
JAMES CROSS,
RICHARD DALLIN,
RODNEY DAMON,
FRANCES DEANS,
CARL DENHAM,
NORMAL DES LAURIERS,
RICHARD DIRKSEN,
CHRISTIE DOUGLASS,
STEVE ELLIOT,
TROY FIELDS,
ALEXANDER ROMAN, JR.,
DANIELLE FONTENOT-O'TOOLE,
BILL GEWALT,

Case No._____

 Division No. _____

**JURY TRIAL DEMANDED**

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

BOBBY GOAD,
THOMAS GORDON,
JOHN GORNEY,
EDWIN HANSEN,
LINDA HARVILL,
DAVE HUMMI,
PRISCILLA JOHNSON,
KERRY JONES,
ALFRED KILBOURNE,
ROBERT KUN,
RICHARD MERNA,
TROY MIHALINAC,
NANCY MUCHA,
ROBIN NEAL,
BARBARA NICHTER,
PAULA PECK,
EDWARD PERRY,
CARL PIAZZA,
WILLIAM PORTA,
ROSE POWELL,
MARK RADOMINKSKI,
CHRIS REMLEY,
ALLAN RICKARDS,
DESERI ROPER,
MARIE RYNEARSON,
TIM SAGARSEE,
ALISA SHARP,
EARLYNN SHEEHAN,
MURTELL SLIGH,
LOIS SMITH,
ERNEST SNYDER,
ROBERT SPADA,
ROBERT STERLING,
RUSSEL TOLLEFSON,
SHERMAN TROUT,
WILLIAM TURNER, JR.,
THOMAS VANFOSSEN,
ISRAEL VEGA,
STEPHEN WAYSHAK,
CATHLEEN WILK,
GERALD WYBRANSKI.

Plaintiffs,

**v.**

Electronically Filed - St. Louis County - November 19, 2018 - 11:09 AM

**MONSANTO COMPANY**
Serve:  Registered Agent
        CSC of St. Louis County, Inc.
        130 South Bemiston Avenue
        Suite 700
        Clayton, MO 63105

        Defendant.

## PETITION

COME NOW Plaintiffs, RONALD KLOCK by and through his representative, JEAN KLOCK, JEAN KLOCK surviving spouse of RONALD KLOCK, on behalf of all legal heirs of RONALD KLOCK, RONNIE ARD, by and through his representative SANDI ARD, SANDI ARD, surviving spouse of RONNIE ARD, on behalf of all legal heirs of RONNIE ARD, HENRY CLARK, by and through his representative, PATRICIA CLARK, PATRICIA CLARK surviving spouse of HENRY CLARK, on behalf of all legal heirs of HENRY CLARK, MELVIN HARVELL, by and through his representative, SUE HARVELL,SUE HARVELL surviving spouse of MELVIL HARVELL, on behalf of all legal heirs of MELVIL HARVELL, SALLY GEISE, by and through her representative GARY GEISE, GARY GEISE surviving spouse of SALLY GEISE on behalf of all legal heirs of SALLY GEISE, JAMES BINGHAM, ANITA BOUCK, JEFFREY BREEDEN, NELSON BRITTEN, BRUCE BUTTERFIELD, RHENITA CLAY, GAIL COILTON, BARBARA CORCORAN, JAMES CROSS, RICHARD DALLIN, RODNEY DAMON, FRANCES DEANS, CARL DENHAM, NORMAL DES LAURIERS, RICHARD DIRKSEN, CHRISTIE DOUGLASS, STEVE ELLIOT, TROY FIELDS, ALEXANDER ROMAN, JR., DANIELLE FONTENOT-O'TOOLE, BILL GEWALT, BOBBY GOAD, THOMAS GORDON, JOHN GORNEY, EDWIN HANSEN, LINDA HARVILL, DAVE HUMMI, PRISCILLA JOHNSON, KERRY JONES, ALFRED KILBOURNE, ROBERT

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

KUN, RICHARD MERNA, TROY MIHALINAC, NANCY MUCHA, ROBIN NEAL, BARBARA NICHTER, PAULA PECK, EDWARD PERRY, CARL PIAZZA, WILLIAM PORTA, ROSE POWELL, MARK RADOMINKSKI, CHRIS REMLEY, ALLAN RICKARDS, DESERI ROPER, MARIE RYNEARSON, TIM SAGARSEE, ALISA SHARP, EARLYNN SHEEHAN, MURTELL SLIGH, LOIS SMITH, ERNEST SNYDER, ROBERT SPADA, ROBERT STERLING, RUSSEL TOLLEFSON, SHERMAN TROUT, WILLIAM TURNER, JR., THOMAS VANFOSSEN, ISRAEL VEGA, STEPHEN WAYSHAK, CATHLEEN WILK, GERALD WYBRANSKI, by and through their counsel, and for their cause of action against defendant Monsanto Company state to the Court as follows:

## INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). All Plaintiffs in this action seek recovery for damages as a result of developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing NHL. No Plaintiff knew of an association between exposure to Roundup® and the increased risk of developing NHL until well after July 29, 2015, when the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup.

I.     **THE PARTIES**

1.     Plaintiff JEAN KLOCK is the representative of Ronald Klock, deceased and lives in Kirkland, Illinois. She is the next of kin and Personal Representative of the Estate of Ronald Klock, an Illinois Estate. At the time of his death, Mr. Klock was a resident of Illinois. Mr. Klock was first exposed in approximately 1990 in the City of Kirkland through approximately 2000 and was diagnosed with a form of Non-Hodgkin's lymphoma. Mr. Klock died of his injuries in 2006.

2.     Plaintiff SANDI ARD is the representative of Ronnie Ard, deceased and lives in Vallejo, California. She is the next of kin and Personal Representative of the Estate of Ronnie Ard, a California Estate. At the time of his death, Mr. Ard was a resident of California. Mr. Ard was first exposed in approximately 1986 in the City of Vallejo through approximately 2016 and was diagnosed with a form of Non-Hodgkin's lymphoma. Mr. Ard died of his injuries in 2017.

3.     Plaintiff PATRICIA CLARK is the representative of Henry Clark, deceased and lives in Kissimee, Florida. She is the next of kin and Personal Representative of the Estate of Henry Clark, a Florida Estate. At the time of his death, Mr. Clark was a resident of Florida. Mr. Clark was first exposed in approximately 1974  in the state of California through approximately 2018 and was diagnosed with a form of Non-Hodgkin's lymphoma. Mr. Clark died of his injuries in 2018.

4.     Plaintiff SUE HARVELL is the representative of Melvin Harvell, deceased and lives in Salisbury, North Carolina. She is the next of kin and Personal Representative of the Estate of Melvin Harvell, a North Carolina Estate. At the time of his death, Mr. Harvell was a resident of North Carolina. Mr. Harvell was first exposed in approximately 1998  in the state of

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

North Carolina through approximately 2003 and was diagnosed with a form of Non-Hodgkin's lymphoma. Mr. Harvell died of his injuries in 2004.

5.     Plaintiff GARY GEISE is the representative of Sally Geise, deceased and lives in Gretna, Nebraska. He is the next of kin and Personal Representative of the Estate of Sally Geise, a Nebraska Estate. At the time of her death, Mrs. Geise was a resident of Nebraska. Mrs. Geise was first exposed in approximately 1986 in the City of Gretna through approximately 2014 and was diagnosed with a form of Non-Hodgkin's lymphoma. Mrs. Geise died of her injuries in 2016.

6.     Plaintiff James Bingham is and was at all relevant times a resident of Plainfield, IN. Plaintiff Bingham was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1996 in the City of Plainfield through approximately 1999 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

7.     Plaintiff Anita Bouck is and was at all relevant times a resident of Montclair, CA. Plaintiff Bouck was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2013 in the City of Montclair through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

8.     Plaintiff Jeffrey Breeden is and was at all relevant times a resident of Warfordsburg, PA. Plaintiff Breeden was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

approximately 2008 in the City of Warfordsburg through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

9.      Plaintiff Nelson Britten is and was at all relevant times a resident of White Deer, TX. Plaintiff Britten was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2017 in the City of White Deer through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

10.      Plaintiff Bruce Butterfield is and was at all relevant times a resident of Evergreen, CO. Plaintiff Butterfield was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1974 in the City of Evergreen through approximately 2017 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

11.      Plaintiff Rhenita Clay is and was at all relevant times a resident of San Antonio, TX. Plaintiff Clay was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1990 in the City of San Antonio through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

12.      Plaintiff Gail Coilton is and was at all relevant times a resident of Riverside, CA. Plaintiff Coilton was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2011

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

in the City of Riverside through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

13.     Plaintiff Barbara Corcoran is and was at all relevant times a resident of Douglas, MI. Plaintiff Corcoran was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1980 in the City of Douglas through approximately 2014 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

14.     Plaintiff James Cross is and was at all relevant times a resident of Conway, SC. Plaintiff Cross was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1974 in the City of Conway through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

15.     Plaintiff Richard Dallin is and was at all relevant times a resident of Bellport, NY. Plaintiff Dallin was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1996 in the City of Bellport through approximately 2014 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

16.     Plaintiff Rodney Damon is and was at all relevant times a resident of Montevallo, AL. Plaintiff Damon was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1998

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

in the City of Montevallo through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

17.     Plaintiff Frances Deans is and was at all relevant times a resident of kissimmee, FL. Plaintiff Deans was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1994 in the City of kissimmee through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

18.     Plaintiff Carl Denham is and was at all relevant times a resident of Midland, TX. Plaintiff Denham was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2000 in the City of Midland through approximately 2017 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

19.     Plaintiff Norman Des Lauriers is and was at all relevant times a resident of Brooksville, FL. Plaintiff Des Lauriers was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1990 in the City of Brooksville through approximately 2002 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

20.     Plaintiff Richard Dirksen is and was at all relevant times a resident of Pawnee, IL. Plaintiff Dirksen was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1985 in the City of Pawnee through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

21.    Plaintiff Christie Douglass is and was at all relevant times a resident of Heber Springs, AR. Plaintiff Douglass was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 1974 in the City of Heber Springs through approximately 2009 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

22.    Plaintiff Steve Elliott is and was at all relevant times a resident of Sedona, AZ. Plaintiff Elliott was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 1974 in the City of Sedona through approximately 1990 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

23.    Plaintiff Troy Fields is and was at all relevant times a resident of Baltimore, MD. Plaintiff Fields was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 2000 in the City of Baltimore through approximately 2008 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

24.    Plaintiff Alexander Roman, Jr. and was at all relevant times a resident of Wailuku, HI. Plaintiff Roman was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 2010 in the City of Wailuku through approximately 2012 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

25.    Plaintiff Danielle Fontenot-O'Toole is and was at all relevant times a resident of San Francisco, CA. Plaintiff Fontenot-O'Toole was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1996 in the City of San Francisco through approximately 2003 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

26.    Plaintiff Bill Gewalt is and was at all relevant times a resident of Rainbow City, AL. Plaintiff Gewalt was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1990 in the City of Rainbow City through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

27.    Plaintiff Bobby Goad is and was at all relevant times a resident of Picayune, MS. Plaintiff Goad was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2003 in the City of Picayune through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

28.    Plaintiff Thomas Gordon is and was at all relevant times a resident of Albubuerque, NM. Plaintiff Gordon was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2006 in the City of Albubuerque through approximately 2016 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

29.     Plaintiff John Gorny is and was at all relevant times a resident of Kenne Bunk Port, ME. Plaintiff Gorny was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1998 in the City of Kenne Bunk Port through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

30.     Plaintiff Edwin Hansen is and was at all relevant times a resident of Helper, UT. Plaintiff Hansen was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2007 in the City of Helper through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

31.     Plaintiff Linda Harvill is and was at all relevant times a resident of Walhalla, SC. Plaintiff Harvill was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1974 in the City of Walhalla through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

32.     Plaintiff Dave Hummi is and was at all relevant times a resident of Troy, MI. Plaintiff Hummi was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1980 in the City of Troy through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

33.    Plaintiff Priscilla Johnson is and was at all relevant times a resident of Newman, GA. Plaintiff Johnson was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2005 in the City of Newman through approximately 2008 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

34.    Plaintiff Kerry Jones is and was at all relevant times a resident of Lynn, AR. Plaintiff Jones was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1975 in the City of Lynn through approximately 1993 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

35.    Plaintiff Alfred Kilbourne is and was at all relevant times a resident of Ethel, LA. Plaintiff Kilbourne was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2017 in the City of Ethel through approximately 2017 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

36.    Plaintiff Robert Kun is and was at all relevant times a resident of Kalispell, MT. Plaintiff Kun was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2016 in the City of Kalispell through approximately 2017 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

37.    Plaintiff Richard Merna is and was at all relevant times a resident of Quincy, MA. Plaintiff Merna was exposed to, purchased and used Roundup and/or other Monsanto

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1998 in the City of Quincy through approximately 2016 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

38.     Plaintiff Troy Mihalinac is and was at all relevant times a resident of New Galilee, PA. Plaintiff Mihalinac was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1983 in the City of New Galilee through approximately 1998 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

39.     Plaintiff Nancy Mucha is and was at all relevant times a resident of Pittsboro, IN. Plaintiff Mucha was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2004 in the City of Pittsboro through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

40.     Plaintiff Robin Neal is and was at all relevant times a resident of Mineral, VA. Plaintiff Neal was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1997 in the City of Mineral through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

41.     Plaintiff Barbara Nichter is and was at all relevant times a resident of Buffalo, NY. Plaintiff Nichter was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2008

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

in the City of Buffalo through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

42.     Plaintiff Paula Peck is and was at all relevant times a resident of Martinez, CA. Plaintiff Peck was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2000 in the City of Martinez through approximately 2014 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

43.     Plaintiff Edward Perry is and was at all relevant times a resident of Hialeah, FL. Plaintiff Perry was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1998 in the City of Hialeah through approximately 1999 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

44.    Plaintiff Carl Piazza is and was at all relevant times a resident of Ridge, NY. Plaintiff Piazza was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1996 in the City of Ridge through approximately 2007 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

45.    Plaintiff William Porta is and was at all relevant times a resident of Tuscon, AZ. Plaintiff Porta was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2000 in the City of Tuscon through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

46.    Plaintiff Rose Powell is and was at all relevant times a resident of Grand Prairie, TX. Plaintiff Powell was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2000 in the City of Grand Prairie through approximately 2008 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

47.    Plaintiff Mark Radominkski is and was at all relevant times a resident of Lackawanna, NY. Plaintiff Radominkski was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2008 in the City of Lackawanna through approximately 2015 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

48.     Plaintiff Chris Remley is and was at all relevant times a resident of Amarillo, TX. Plaintiff Remley was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 2003 in the City of Amarillo through approximately 2017 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

49.     Plaintiff Allan Rickards is and was at all relevant times a resident of Tomball, TX. Plaintiff Rickards was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 1990 in the City of Tomball through approximately 2010 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

50.     Plaintiff Deseri Roper is and was at all relevant times a resident of Pueblo West, CO. Plaintiff Roper was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 1993 in the City of Pueblo West through approximately 2017 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

51.     Plaintiff Marie Rynearson is and was at all relevant times a resident of Payette, ID. Plaintiff Rynearson was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 1980 in the City of Payette through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

52.     Plaintiff Tim Sagarsee is and was at all relevant times a resident of Jasonville, IN. Plaintiff Sagarsee was exposed to, purchased and used Roundup and/or other Monsanto

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2 in the City of Jasonville through approximately 2016 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

53.    Plaintiff Alisa Sharp is and was at all relevant times a resident of Papillion, NE. Plaintiff Sharp was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1975 in the City of Papillion through approximately 1997 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

54.    Plaintiff Earlynn Sheehan is and was at all relevant times a resident of South Jordan,, UT. Plaintiff Sheehan was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1993 in the City of South Jordan, through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

55.    Plaintiff Murtnell Sligh is and was at all relevant times a resident of RALEIGH, NC. Plaintiff Sligh was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2011 in the City of RALEIGH through approximately 2012 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

56.    Plaintiff Lois Smith is and was at all relevant times a resident of Indianapolis, IN. Plaintiff Smith was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1980 in the City

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

of Indianapolis through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

57.    Plaintiff Ernest Snyder is and was at all relevant times a resident of Tucson, AZ. Plaintiff Snyder was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 2000 in the City of Tucson through approximately 2008 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

58.    Plaintiff Robert Spada is and was at all relevant times a resident of Highland Ranch, CO. Plaintiff Spada was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 1981 in the City of Highland Ranch through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

59.    Plaintiff Robert Sterling is and was at all relevant times a resident of Littleton, CO. Plaintiff Sterling was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 2016 in the City of Littleton through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

60.    Plaintiff Russell Tollefson is and was at all relevant times a resident of Gulfport, FL. Plaintiff Tollefson was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff was first exposed in approximately 1990 in the City of Gulfport through approximately 2011 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

61.     Plaintiff Sherman Trout is and was at all relevant times a resident of Taylor, MI. Plaintiff Trout was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2015 in the City of Taylor through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

62.     Plaintiff William Turner, Jr. is and was at all relevant times a resident of Ellisville, MS. Plaintiff Turner, Jr. was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1996 in the City of Ellisville through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

63.     Plaintiff Thomas Vanfossen is and was at all relevant times a resident of Johnstown, PA. Plaintiff Vanfossen was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1982 in the City of Johnstown through approximately 2012 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

64.     Plaintiff Israel Vega is and was at all relevant times a resident of Union, NJ. Plaintiff Vega was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2012 in the City of Union through approximately 2017 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

65.     Plaintiff Stephen Wayshak is and was at all relevant times a resident of Clearlake, CA. Plaintiff Wayshak was exposed to, purchased and used Roundup and/or other Monsanto

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2013 in the City of Clearlake through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

66.    Plaintiff Cathleen Wilk is and was at all relevant times a resident of Catasauqua, PA. Plaintiff Wilk was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 2011 in the City of Catasauqua through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

67.    Plaintiff Gerald Wybranski is and was at all relevant times a resident of Chadda Ford, PA. Plaintiff Wybranski was exposed to, purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup").  Plaintiff was first exposed in approximately 1993 in the City of Chadda Ford through approximately 2018 and was diagnosed with Non-Hodgkin's Lymphoma as a result of Roundup exposure.

## Defendant

68.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

69.    At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

## II.    INTRODUCTION

70.    In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

71.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

72.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

73.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

74.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

75.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

76.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

77.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

III.    **JURISDICTION AND VENUE**

78.     At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the County of St. Louis.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

79.    At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, and therefore is a local defendant for purposes of removal and diversity jurisdiction.

80.    Plaintiffs have timely filed this lawsuit less than two years from the time the Plaintiffs knew or reasonably knew of the injury and that it may have been wrongfully caused.

81.    Venue is proper in the St. Louis County pursuant to RSMo. §508.010(14) because this is a tort case in which Plaintiffs were first injured outside of Missouri, and the registered agent for Defendant Monsanto is located in St. Louis County.

## IV.    FACTS

82.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

83.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

84.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries,

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

85.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

86.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

87.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

88.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

89.    The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the States of Missouri.

90.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

91.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

92.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

93.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

94.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

95.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

96.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

subsequently audited IBT; it too found the toxicology studies conducted for the Roundup®
herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at
IBT, that it was "hard to believe the scientific integrity of the studies when they said they took
specimens of the uterus from male rabbits."

97.    Three top executives of IBT were convicted of fraud in 1983.

98.    In the second incident of data falsification, Monsanto hired Craven Laboratories
in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year,
the owner of Craven Laboratories and three of its employees were indicted, and later convicted,
of fraudulent laboratory practices in the testing of pesticides and herbicides.

99.    Despite the falsity of the tests that underlie its registration, within a few years of
its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

100.    The success of Roundup® was key to Monsanto's continued reputation and
dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's
agriculture division was out-performing its chemicals division's operating income, and that gap
increased yearly. But with its patent for glyphosate expiring in the United States in the year
2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off
impending competition.

101.    In response, Monsanto began the development and sale of genetically engineered
Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate;
farmers can spray Roundup® onto their fields during the growing season without harming the
crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000,
Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

102.    Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

103.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

104.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

  a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

  b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

  c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

  d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

  e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

  f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

105. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

106. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

*Classifications and Assessments of Glyphosate*

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

107.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

108.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

109.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

110.    In assessing an agent, the IARC Working Group reviews the following information:

      a)    human, experimental, and mechanistic data;

      b)    all pertinent epidemiological studies and cancer bioassays; and

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

c)       representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

111.    In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

112.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

113.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

114.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

115.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

116.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

117.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

118.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

119.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

120.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

121.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

122.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

123.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

124.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

125.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

126.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

127.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

128.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

129.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

130.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

131.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

132.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

133.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

134.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

135.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

136.    Indeed, even as of July 2016, Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).1

137.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

138.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

139.    Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were

---

[1] <u>Backgrounder - Glyphosate: No Evidence of Carcinogenicity</u>. Updated November 2014. (downloaded October 9 2015)

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## V.    CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)
### (AGAINST MONSANTO)

140.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

141.    Plaintiffs bring this strict liability claim against Monsanto for defective design.

142.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, as described above.

143.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

144.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

145.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

146.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

147.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

148.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)      When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

b)    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h)    Monsanto could have employed safer alternative designs and formulations.

149.    Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

150.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

151.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

152.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

153.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

154.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

155.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

156.    The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

157.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

158.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT II**
**STRICT LIABILITY (FAILURE TO WARN)**
**(AGAINST MONSANTO)**

159.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

160.    Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

161.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

162.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

163.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

164.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

165.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

166.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

167.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

168.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

169.    Plaintiffs were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

170.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

171.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

172.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

173.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

174.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

175.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

176.    Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

177.    The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

178.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

179.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT III**
**NEGLIGENCE**
**(AGAINST MONSANTO)**

180.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

181.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

182.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion,

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

183.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

184.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

185.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

186.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

187.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

188.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

189.    Monsanto was negligent in the following respects:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

e)    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g)    Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h)    Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i)    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j)    Representing that its Roundup® products were safe for their intended use when, in fact,  Monsanto knew or should have known that the products were not safe for their intended purpose;

k)    Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l)    Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

m)      Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n)      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

190.    Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

191.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

192.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

193.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

194.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT IV**
**(WRONGFUL DEATH)**
**(AGAINST MONSANTO)**

195.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

196.    Plaintiffs bring this claim on behalf of and for the benefit of the Plaintiffs Barbara Brandt, Rita Watson, Raymond Godin, Charles Rayburn Evans, Jim Williams, Andrew Lewis, Erma Hudson, Raymond Turner, Kenneth P. Nowatzke, Adam Englebright and Ruben Pena (herein after referred to as "Decedent Plaintiffs") and their lawful beneficiaries..

197.    As a direct and proximate result of the conduct of the Defendants and the defective nature of Roundup as outlined above, Decedent Plaintiffs suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

198.    As a direct and proximate cause of the conduct of Defendant, Decedent Plaintiffs' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent Plaintiffs' death. Decedent Plaintiffs brings this claim on behalf of their lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT V**
**(SURVIVAL ACTION)**
**(AGAINST MONSANTO)**

199.    197.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

200.    As a direct and proximate result of the conduct of Defendant, where appropriate, Decedent Plaintiffs, prior to their death, were obligated to spend various sums of money to treat their injuries, which debts have been assumed by their Estates. As a direct and proximate cause of the aforesaid, Decedent Plaintiffs endured pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of their deaths; and, as a direct and proximate result of the aforesaid, Decedent Plaintiffs lawful beneficiaries suffered a loss of earnings and earning capacity. Decedent Plaintiffs brings this claim on behalf of their respective estates under applicable state statutory and/or common laws.

201.    As a direct and proximate result of the conduct of Defendant, Decedent Plaintiffs and their spouse and heirs, until the time of their death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

202.    As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedent Plaintiffs until the date of their death,

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

Decedent Plaintiffs' spouses and heirs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Decedent Plaintiffs' spouses and/or heirs, Personal Representative of their respective estates, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

WHEREFORE, Decedent Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

WHEREFORE, Plaintiffs pray for judgment against Defendant for compensatory damages as set forth above and for exemplary damages for the in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) to punish Defendant, and to deter Defendant and other businesses from like conduct, and such other and further relief as this Court deems just, proper, and equitable.

### VI. JURY DEMAND

203.    PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS.

Dated: Edwardsville, Illinois
        November 19, 2018

Electronically Filed - St Louis County - November 19, 2018 - 11:09 AM

Respectfully,

NAPOLI SHKOLNIK PLLC

*/s/ Wilson D. Sikes*

Wilson Sikes, MO Bar #69579.
Mark Twain Plaza III
105 West Vandalia Street, Suite 475
Edwardsville, Illinois 62025
(212) 397-1000
***Attorney for Plaintiffs***